**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT D. MILLER**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:16cv93 |
| | ) | **Electronic Filing** |
| **COCA-COLA REFRESHMENTS USA, INC.** | ) | |
| **d/b/a COCA-COLA REFRESHMENTS,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

March 23, 2018

## I.    <u>INTRODUCTION</u>

Plaintiff, Robert D. Miller ("Miller" or "Plaintiff") filed a five count Complaint alleging one count of age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA"), three counts of disability discrimination (failure to accommodate, failure to hire/unlawful termination and retaliation) in violation of the Americans with Disability Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), and one count claiming violations of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 *et seq.* (the "PHRA") against Defendant, Coca-Cola Refreshments USA, Inc. d/b/a Coca-Cola Refreshments ("CCR" or "Defendant").  CCR filed a motion for summary judgment (ECF Nos. 24, 25 and 37), Miller responded (ECF No. 30) and the motion is now before the Court.

## II.    STATEMENT OF THE CASE

CCR is engaged in the production, sale and distribution of Coca-Cola® and other related products.  Defendant's Statement of Material Facts in Support of Motion for Summary Judgment (hereinafter, "Def.'s SOMF") (ECF No. 26) ¶ 1.  In 1976, Miller was hired as a truck driver by an independent Coca-Cola bottling company in Houston, Pennsylvania.  *Id.* ¶ 2.  In approximately 1999, Miller transitioned to a merchandising position when the bottling company was acquired by Coca-Cola Enterprises, Inc.  *Id.* ¶ 3.  Is 2008, Miller assumed the position of Account Manager – Large Store (the "Account Manager position").  *Id.*  ¶ 4.

After CCR acquired Coca-Cola Enterprises in 2010, Miller remained in the Account Manager position until his employment was terminated on May 30, 2013.  Def.'s SOMF ¶¶ 5, 6. In that position, Miller oversaw approximately 25 customer accounts, which included supermarkets and discount department stores such as Giant Eagle, Wal-Mart, Shop 'N Save and Foodland.  *Id.* ¶ 7.  As an Account Manager, Miller was responsible for maintaining a relationship with the customers, determining the stores' product needs, placing and transmitting product orders, maintaining appropriate inventory levels, replacing and maintaining advertising materials and ensuring that stores complied with CCR's merchandising standards.  *Id.* ¶¶ 8, 9.  CCR's written description of the Account Manager position lists one of the job duties as "[p]eriodic lifting of 50+ pounds, bending, reaching, kneeling and light merchandising."  *Id.* ¶ 11; Deposition of Robert D. Miller ("Miller Dep.") (ECF No. 27-2) Ex. 2.

CCR's products, which include 6 packs, 12 packs, 20 packs and cases of 2-liter bottles of soda, were delivered to the large store accounts and stored on rows of pallets located in the back room of the store.  Def.'s SOMF ¶ 12.  To assess inventory levels and determine a store's product needs, Account Managers sometimes had to pull individual pallets out from the rows of pallets

using a hand jack, or lift individual packs or cases.  *Id.* ¶ 14.  Although CCR employed merchandisers to bring products from the back room to the sales floor and stock the shelves, Account Managers also were expected to stock the shelves if they were low.  *Id.* ¶ 15.  This entailed lifting the products off of the pallets stored in the back room, placing them on a cart and pushing the cart out to the sales floor, where the Account Manager would then transfer the products to the shelves or displays.  *Id.* ¶¶ 16, 17.  According to Miller, CCR's policy was that the last man in the store was responsible for the account, which meant that he was required to re-stock the shelves if they were empty or if a merchandiser had not done his job.  *Id.* ¶ 18.  Miller explained that it was impossible to predict when that situation might occur, but he estimated that 25-30% of his work day involved lifting.  *Id.* ¶¶ 19, 46.

On November 27, 2011, Miller suffered a stroke.  Def.'s SOMF ¶ 33.  Miller's request for medical leave was approved under CCR's Family and Medical Leave ("FML") and Short Term Disability ("STD") policies for a leave of absence beginning on November 27, 2011, through February 17, 2012.  *Id.* ¶ 35.

On February 7, 2012, Miller spoke with Heather Wade, a CCR Human Resources team member, and explained that he would require an additional 4-6 weeks off from work.  Miller Dep. 69:18-71:15; Miller Dep. Ex. 14.  Wade's notes concerning their conversation indicate that Miller had contacted UNUM, CCR's third-party leave administrator, to initiate a request for an extension of his leave.  Miller Dep. Ex. 14.  On February 16, 2012, UNUM advised Miller that he had been approved for disability leave through February 29, 2012.  Def.'s SOMF ¶ 38.  However, UNUM informed Miller that February 17, 2012, was his last day of protected leave under the FMLA and that due to the exhaustion of his FML leave, CCR no longer was required to hold open his position.  *Id.* ¶ 39.  Miller understood this information.  *Id.* ¶ 40.  UNUM directed Miller to contact CCR's

human resources team to discuss his ability to return to his position, as well as other options available to him if he was unable to do so. *Id.* ¶ 41; Miller Dep. Ex. 13.

After Miller contacted human resources, he submitted to CCR a letter dated February 20, 2012, from his therapist which stated:

> Upon receipt of Mr. Miller's job description, it is apparent that he cannot safely perform his job duties as assigned, specifically, 'periodic lifting of 50+ pounds.'[1] He could, however, perform light duty work as long as it does not include either single or repetitive lifts over [the following weight limits]:
>
> | | |
> |---|---|
> | Floor to Knuckle: | 26# |
> | Knuckle to Shoulder: | 11# |
> | Shoulder to Overhead: | 10# |
> | Pull: | 26# |
> | Push: | 13# |
> | Carry (20 ft.): | 25# |

Def.'s SOMF ¶ 43, Miller Dep. Ex. 16.

Between February 22, 2012, and March 9, 2012, Stephanie Duffy, who was CCR's Employee Relations Consultant, consulted with Miller, Jeff Lowe (District Sales Manager), Mario Fiordilino (Area Sales Manager), Kristi Prince (Human Resources representative for the Houston facility) and Heather Wade (Return to Work Coordinator) to determine what accommodation Miller would need in order to perform his job. Def.'s SOMF ¶ 45; Miller Dep. Ex. 17; Deposition of Stephanie Duffy ("Duffy Dep.") (ECF No. 27-6) Ex. 8.

Duffy testified that she had a discussion with Miller and asked, "What part of your job is it that you can't do?" Duffy Dep. 33:24-34:5. Miller responded that he was unable to lift more than approximately 20 pounds, and Miller indicated that he spent 25-30% of his day lifting. *Id.* 34:6-34:11. In an undated note, Duffy recorded Miller's response that he spent 25-30% of his day

---

[1] As Miller explained, such lifting was involved in a "[c]ase of two-liters and a case of 20-ounce. If you lifted the whole case they were pretty close to 50 pounds." Miller Dep. 33:9-33:13.

lifting products, and she also wrote that Miller "was agreeable to staying on leave." Def.'s SOMF ¶ 46, Duffy Dep. Ex. 5. On February 27, 2012, Duffy made a note that she spoke with Miller and he was "agreeable to continuing [the] current LOA unless local management can accommodate restrictions. Reaching out to local management to further discuss." Duffy Dep. Ex. 9.

Also on February 27, 2012, Duffy sent an email to Lowe, Fiordilino, Prince and Wade explaining that CCR "has engaged in the accommodations/interactive process with" Miller, listing the lifting restrictions identified by Miller's therapist, noting her understanding that Miller "would typically spend 25-30% of his day lifting product in excess of 25#" and asking whether they knew "of any way to make an accommodation for [him] so that he [could] return to his position." Duffy Dep. Ex. 11. Fiordilino, who had been an account manager for over three years and supervised individuals in that position for approximately ten years, responded that it would be very difficult to make accommodations for the Account Manager position. Deposition of Mario Fiordilino, Jr. ("Fiordilino Dep.") (ECF No. 27-4) 24-30; Duffy Dep. Ex. 11. CCR ultimately determined that there was no reasonable accommodation that would allow Miller to perform the essential functions of the Account Manager position. Duffy Dep. Ex. 8 at 11-16.

Duffy documented the process that had occurred on a form entitled "CCR Case Summary/Checklist for Accommodation Request." *See* Duffy Dep. Ex. 8. The form indicates that the accommodation request was initiated because of Miller's medical restriction, that he was unable to lift, pull or push more than 26 pounds, and that he spends 25-30% of his day lifting products. *Id.* at 4, 6. The form specified that it was "unknown" what accommodation Miller believed he needed to perform his job. *Id.* at 7. Duffy testified that she wrote "unknown" because Miller did not know what accommodation he needed when she asked him. Duffy Dep. 139:1-139:13. The form also indicated that Miller's job as an Account Manager could not be modified

or restructured. Duffy Dep. Ex. 8 at 11. The proposed accommodation was identified as continuing Miller's leave of absence until November 26, 2012. *Id.* at 16. The form indicates that Duffy, Lowe, Fiordilino, Prince and Wade were involved in the process on behalf of CCR. *Id.* at 3, 16.

On March 9, 2012, Duffy and Miller spoke to discuss his options. Miller Dep. 77:18-78:1; Miller Dep. Ex. 17. Miller acknowledged that "we agreed that [CCR] could and [would] leave [him] on his current leave of absence." Miller Dep. 78:2-78:18; Miller Dep. Ex. 17. Miller testified that he did not suggest to Duffy any alternative to a leave of absence, he did not ask if he could return to the Account Manager position at that time, he was not aware of any accommodation that would have allowed him to do so, nor did he suggest any accommodation. Miller Dep. 78:19-79:9.

Duffy sent a letter to Miller confirming their March 9, 2012, conversation, and the agreement that CCR would continue him on the leave of absence. Miller Dep. Ex. 17. The letter stated that Miller should contact Duffy if he had any questions, and he should let her know if the "arrangement [was] no longer effective." *Id.* Miller admitted that he never contacted Duffy for either reason. Miller Dep. 80:3-80:15.

While Miller was on leave, relief employees or a district manager covered his route and duties, but that arrangement could not continue indefinitely due to CCR's business needs. Fiordilino Dep. 70:17-71:10, 129:21-130:7. Between March 9, 2012, and May 25, 2012, Miller did not contact anyone at CCR regarding his return to work. Def.'s SOMF ¶ 55. In the interim, CCR hired Samantha Wooster (age 26) on April 28, 2012, and Cheryl Neuman (age 54) on May 15, 2012, to work as large store account managers. *Id.* ¶ 57.

On or about May 25, 2012, Miller was cleared to return to work with no restrictions. Def.'s SOMF ¶ 54. When Miller contacted CCR in late May 2012, regarding his return to work, he was advised that his position had been filled. Miller Dep. 83:5-16. However, CCR granted Miller two special personal leaves of absence ("SPLOA") between June 15, 2012, and April 26, 2013, so that he could apply for open positions for which he was qualified. Def.'s SOMF ¶ 59; Miller Dep. Exs. 18 and 21.

On July 6, 2012, Miller applied for the position of Warehouse Manager. Def.'s SOMF ¶ 60. Miller did not receive an interview for that position, and he admitted that he was not qualified for it. *Id.* ¶¶ 61, 62. The individual who was hired to fill the Warehouse Manager position was the same age as Miller. *Id.* ¶ 63.

On August 8, 2012, Miller applied for the position of Market Development Manager. Def.'s SOMF ¶ 64. Miller described the Market Development Manager position as "basically a sales job" that involved "[a] lot of cold call[s]" to generate new business in the Beaver Falls, Pennsylvania area. *Id.* ¶ 65. Although Miller believed that his prior work experience as an Account Manager made him qualified for the Market Development Manager position, Miller stated that he never brought in any new accounts during his time as an Account Manager. Miller Dep. 92:10-93:13.

CCR employee Eric Storer interviewed Miller for the Market Development Manager position. Def.'s SOMF ¶¶ 67, 68. Miller admitted that he never met Storer prior to the interview, and he had no reason to believe that Storer was aware of his prior medical condition. *Id.* ¶ 69.

Miller was not hired for the Market Development Manager position. Def.'s SOMF ¶ 70. Rather, Storer extended an offer to Sean Martin (age 42), who met most, if not all of the job requirements, and who Storer deemed to be best suited for the position out of the pool of qualified

candidates.  Declaration of Eric Storer ("Storer Decl.") (ECF No. 27-8) ¶ 10.  After Martin declined the offer, Storer extended an offer to the second choice, Russell Graham (age 27).  *Id.* ¶ 12; Def.'s SOMF ¶ 72.  Graham accepted the offer and was hired as the Market Development Manager. Storer Decl. ¶ 13.

Miller did not apply for any other positions with CCR.  Def.'s SOMF ¶ 73.  Miller's second SPLOA expired on April 26, 2013.  *Id.* ¶ 74.  Because Miller did not secure a position with CCR during his two SPLOA periods, CCR terminated his employment effective May 30, 2013.  *Id.*; Miller Dep. Ex. 22.  Amy Corbell, who was CCR's Employee Relations Consultant, initiated the request for dismissal, which was approved by Patrick Kennedy (District Sales Manager), Roger Maher (Market Unit Director of Retail Sales) and Kristi Prince (HR Business Partner).  Def.'s SOMF ¶ 75; Declaration of Robin Gee ("Gee Decl.") (ECF No. 27-1) ¶¶ 15, 16 and Ex. 1.

Miller claims that while he was employed with CCR, his supervisors referred to him as "old school."  Def.'s SOMF ¶ 76.  Miller interpreted the "old school" remark as being accompanied by "more of a jokingly" attitude, and he was not usually offended by it.  Miller Dep. 29:11-17. Further, the "old school" remark was not directed solely at Miller.  Def.'s SOMF ¶ 78.  Finally, Miller admitted that none of his supervisors ever made any negative or derogatory comments about his alleged disability.  *Id.* ¶ 79.

### III.     <u>LEGAL STANDARD FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law.  To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a

verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id.* The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Whiteland Woods, L.P. v. Twp. of West Whiteland*, 193 F.3d 177, 180 (3d Cir. 1999).

When the moving party has carried its burden under Rule 56, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (citation omitted).

## IV.　DISCUSSION

### A.　ADEA and PHRA

Miller claims that CCR discriminated against him because of his age by failing to return him to the Account Manager position, failing to offer him the Market Development Manager position and terminating his employment with CCR.  *See* Compl. (ECF No. 1) ¶¶ 50-53.  CCR argues that it is entitled to summary judgment on Miller's age discrimination claim under the ADEA and PHRA[2] because he cannot prove that "but for" his age, CCR would not have taken the employment actions about which Miller complains.  *See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (ECF No. 25) at 20-23.  Miller opposes summary judgment, arguing that CCR's stated reasons for its employment actions concerning him were actually a pretext for age discrimination.  *See* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") (ECF No. 30) at 24-25.

Under the ADEA, an employer is prohibited from discharging any individual, or otherwise discriminating against an individual with respect to compensation, terms, conditions or privileges of employment, because of the individual's age.  *See* 29 U.S.C. § 623(a)(1).  A plaintiff can sustain a claim of discrimination under the ADEA by presenting either direct or circumstantial evidence of discrimination.  *See Duffy v. Magic Paper Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001).  Because Miller has not provided direct evidence of discrimination, our inquiry is governed by the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (reaffirming the use of the *McDonnell Douglas* analysis in ADEA cases involving indirect evidence).

---

[2]　　There is no need to differentiate between Miller's age discrimination claim under the ADEA and PHRA because the same analysis is used for each.  *See Simpson*, 142 F.3d at 643 n.4.

Miller bears the initial burden of establishing a *prima facie* case of discrimination. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997). To establish a *prima facie* case, Miller must demonstrate that: (1) he is 40 years of age or older; (2) he was qualified for the position in question; (3) he was subject to an adverse employment action; and (4) he was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. *Smith*, 589 F.3d at 689 (citing *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004)). To establish a *prima facie* case at summary judgment, "the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] *prima facie* case." *Duffy*, 265 F.3d at 167 (internal quotation marks and citation omitted).

Assuming here that Miller has established a *prima facie* case of age discrimination,[3] the burden shifts to CCR to offer a legitimate, non-discriminatory reason for taking the adverse employment action. *Simpson*, 142 F.3d at 644 n.5; *Keller*, 130 F.3d at 1108. This burden is "relatively light" and is satisfied if the employer provides evidence, "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)); *see also Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) (describing this step as a "minimal burden").

---

[3] Miller was between 59 and 60 years old when the events at issue in this case occurred. He arguably was subject to an adverse employment action, and CCR hired younger individuals for both the Account Manager position (Samantha Wooster, age 26) and the Market Development Manager position (Russell Graham, age 27). Although there is no dispute that Miller was qualified for the Account Manager position, there is a question as to whether he was qualified for the Market Development Manager position, which involved generating new business. As to that requirement, Miller admitted that he never brought in any new accounts during his tenure as an Account Manager. Def.'s SOMF ¶ 65; Miller Dep. 92:10-93:13. Because we must consider the facts in the light most favorable to Miller, we will assume without deciding that he has established a *prima facie* case of age discrimination.

CCR has met its relatively light burden. First, CCR explained that Miller was not returned to the Account Manager position in February 2012, because there was no reasonable accommodation which would have allowed him to perform the essential functions of that job.[4] Duffy Dep. Ex. 8 at 11-16. While Miller was on extended leave, other employees initially covered his route and duties, but that arrangement could not continue indefinitely due to CCR's business needs. Fiordilino Dep. 70:17-71:10, 129:21-130:7. Miller did not contact anyone at CCR between March 9, 2012, and May 25, 2012, regarding his return to work. Def.'s SOMF ¶ 55; *see Provenzano v. Thomas Jefferson Univ. Hosp.*, No. Civ. A. 02-6584, 2004 WL 1146653, at *3 (E.D. Pa. May 20, 2004) ("When the duration of the inability to perform the job is unknown, the employer cannot be expected to keep the position open."). In the interim, CCR hired Samantha Wooster (age 26) and Cheryl Neuman (age 54)[5] to work as large store Account Managers on April 28, 2012, and on May 15, 2012, respectively. *Id.* ¶ 57. Therefore, when Miller contacted CCR in late May 2012, to advise that he was cleared to return to work with no restrictions, he was informed that his position had been filled. *Id.* ¶ 54; Miller Dep. 83:5-16. Based on this evidence, the Court finds that CCR has articulated legitimate, non-discriminatory reasons for not returning Miller to the Account Manager position.

The Court likewise finds that CCR has offered legitimate, non-discriminatory reasons for not hiring Miller for the Market Development Manager position and for terminating his employment. CCR explained that Miller was not hired for the Market Development manager

---

[4]      *See infra* pp. 26-28.

[5]      The hiring of Neuman, who was 54, does not support an inference of discriminatory animus because she was not substantially younger than Miller, who was 60. *See Narin v. Lower Merion Sch. Dist.*, 206 F.3d 323, 333 n.9 (3d Cir. 2000) (determining that an age difference of 7 years was insufficient to create an inference of discrimination).

position because Eric Storer, who interviewed him, deemed Sean Martin (age 42) to be best suited for the position out of the pool of qualified candidates. Storer Decl. ¶ 10. After Martin declined the job offer, Storer extended an offer to Russell Graham (age 27), who was the second choice. *Id.* ¶ 12; Def.'s SOMF ¶ 72. CCR additionally explained that Miller's employment was terminated because he did not secure a position with CCR prior to the expiration of his two SPLOA periods. Def.'s SOMF ¶ 74; Miller Dep. Ex. 22.

Because CCR has offered legitimate, non-discriminatory reasons for each adverse employment action, the burden shifts back to Miller to show that those reasons were a pretext for age discrimination. *Simpson*, 142 F.3d at 644 n.5. An employee may demonstrate that his employer's legitimate, non-discriminatory reason is pretextual by submitting evidence that allows a factfinder to either 1) disbelieve the employer's articulated legitimate reasons; or 2) believe discrimination was more likely than not a "but for" cause of the adverse employment action. *Abels v. Dish Network Serv., LLC*, 507 F. App'x 179, 183 (3d Cir. 2012) (citing *Fuentes*, 32 F.3d at 764). Evidence undermining an employer's proffered legitimate reasons must be sufficient to "support an inference that the employer did not act for its stated reasons." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995).

In order to discredit CCR's proffered justification under the first prong listed above, Miller must present evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered reasons "that a reasonable factfinder could rationally find them unworthy of credence," and ultimately infer that CCR did not act for the asserted nondiscriminatory reasons. *Fuentes*, 32 F.3d at 765. If Miller's evidence rebutting CCR's proffered reasons permits a factfinder to conclude that they were either a "post hoc fabrication" or otherwise did not actually prompt the employment action, then summary judgment is

inappropriate. *Id.* at 764. Here, Miller has not pointed to any evidence that would cause the Court to disbelieve CCR's reasons for the employment decisions at issue.

Miller also has not shown that age-based discrimination was a "but for" cause of CCR's adverse employment decisions. To meet this burden, Miller "cannot simply show that [CCR's] decision was wrong or mistaken." *Fuentes*, 32 F.3d at 765. The question is whether CCR was motivated by a discriminatory animus, not whether it was wise, shrewd, prudent or competent. *See id.*; *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) ("[A]n employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason."). Miller has not shown that CCR previously discriminated against him or other individuals over the age of 40, nor has he shown that CCR treated similarly situated younger individuals more favorably. *See Simpson*, 142 F.3d at 645 (citing *Fuentes*, 32 F.3d at 765).

Miller's only "evidence" to support his contention that CCR's articulated reasons for its employment decisions were a pretext for age discrimination is that his supervisors sometimes referred to him as "old school," and he perceived that CCR's culture was shifting toward hiring younger employees. This "evidence" does not suffice to establish pretext.

First, the reference to Miller as "old school" is not probative of discrimination. In considering whether stray remarks, such as the "old school" remark allegedly made by Miller's supervisors, are probative of discrimination, the Court of Appeals for the Third Circuit has considered the following factors: "(1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement." *Parker v. Verizon Pa., Inc.*, 309 F. App'x 551, 558-59 (3d Cir. 2009) (citing *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997)). "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the

decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992).

Fiordilino and Lowe are the only decision makers who allegedly referred to Miller as "old school." *See* Miller Dep. 15:14-15:25; Declaration of George Spencer ("Spencer Decl.") (ECF No. 32-2) ¶ 37. However, there is no evidence that either Fiordilino or Lowe made the remark "old school" in close temporal proximity to CCR's determination that there was no reasonable accommodation which would have enabled Miller to return to the Account Manager position in February 2012. Further, there is no evidence that any other reference to Miller as "old school" was made in close temporal proximity to the events in question, nor is there evidence that any such remark was made in the context of an employment decision or that any individual who made the remark was a decision maker relative to the employment action at issue.[6] The Court finds that the "old school" remark was benign[7] and unrelated to any of the adverse employment actions and, therefore, carries virtually no weight in proving a discriminatory age-based animus. *See, e.g., Murphy v. Ctr. for Emergency Med. of W. Pa., Inc.*, 944 F. Supp. 2d 406, 436-37 (W.D. Pa. 2013) (a supervisor's references to the plaintiff as "Old Man" and "Blue" qualified as stray remarks and did not constitute evidence of pretext where the plaintiff did not argue that any age-based comments were made in the context of the events leading up to his termination).

---

[6] There is no evidence that Storer, who decided not to hire Miller for the Market Development Manager position, referred to him as "old school," nor is there any evidence that those who initiated and approved Miller's termination (Corbell, Kennedy, Maher and Prince) did so.

[7] The benign nature of the "old school" remark is underscored by Miller's own interpretation that it was accompanied by "more of a jokingly" attitude. Miller Dep. 29:11-17.

The only other "evidence" of pretext that Miller points to comes from George Spencer, who was Miller's co-worker for approximately 30 years, as well as his supervisor at various times during that period. *See* Spencer Decl. ¶¶ 3, 5. Spencer believed that Miller's age played a role in all of CCR's decisions. *See* Spencer Decl. ¶¶ 18, 25, 35.[8] In addition, Spencer expressed skepticism about CCR's approach to hiring younger candidates over candidates with decades more experience, like Miller. *See id.* ¶¶ 31, 32. According to Miller, Spencer's "testimony and declarations would tend to indicate that [CCR] is biased against older employees." ECF No. 30 at 25.

Miller is incorrect. Spencer's statements are not based on personal knowledge, but rather on his own subjective belief that Miller's age played a role in CCR's employment decisions and his skepticism about CCR's hiring practices. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge . . . ."). However, Spencer's subjective belief and skepticism alone are insufficient to establish that CCR's stated reasons for the various employment decisions at issue were a pretext for age discrimination. *See Fowler v. Borough of Westville*, 97 F. Supp. 2d 602, 607 (D.N.J. 2000) ("Affidavits speculating as to motivations but containing no factual support do not conform to the rule and statements prefaced by the phrases, 'I believe' or 'upon information and belief' are properly subject to a motion to strike."); *Keating v. Bucks County Water & Sewer Auth.*, No. Civ. A. 99-1584, 2000 WL 1888770, at *4 (E.D. Pa. Dec. 29, 2000) ("Averments [in an affidavit] based on mere belief, rather than personal knowledge, must be disregarded.").

---

[8] Spencer stated: "I *believe* that the only reason Mr. Miller was not allowed to return to work with the lifting restriction was because of his age;" "I *believe* that the only reason Mr. Miller was not allowed to return to work when he was restriction free was because of his age;" and, "I *believe* that the only reason Mr. Miller was not hired for the Market Development Manager position was because of his age." Spencer Decl. ¶ ¶ 18, 25, 35 (emphasis added).

Miller has not made a showing of pretext because he has not pointed to any evidence in the record which would allow a rationale factfinder to "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause" of CCR's actions, *Burton v. Teleflex, Inc.*, 707 F.3d 417, 427 (3d Cir. 2013), or to "believe discrimination was more likely than not a 'but for' cause of the adverse employment action[s]." *Abels*, 507 F. App'x at 183. Accordingly, the Court finds that Miller's age discrimination claim under the ADEA and PHRA fails as a matter of law, and summary judgment will be entered in favor of CCR on that claim.

**B. ADA and PHRA**

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Miller claims that he was a qualified individual with a disability in February 2012, and he requested a reasonable accommodation to return to the Account Manager position, but CCR failed to accommodate him even though it would not have been unreasonably burdensome to do so. *See* Compl. ¶¶ 56-59. Miller also claims that CCR discriminated against him because of his disability, record of disability and/or perceived disability by failing to hire him for the Market Development Manager position and by terminating his employment.[9] *See id.* ¶¶ 62-65. In addition, Miller contends that CCR did

---

[9] The Court presumes that Miller has abandoned his claim that CCR discriminated against him based on his disability, record of disability and/or perceived disability by failing to hire him for the Warehouse Manager position. *See* Compl. ¶ 64. Miller admitted that he was not qualified for that position, he did not identify it as an issue of law in the parties' Joint Pretrial Stipulation and he made no further argument in his summary judgment briefing to advance any claim vis-à-vis the Warehouse Manager position. *See* Def.'s SOMF ¶ 62, Miller Dep. 89:20-91:23; Pretrial Stip. (ECF No. 23) ¶¶ V.1-V.8.

not hire him for the Market Development Manager position and ultimately terminated him in retaliation for requesting an accommodation.[10]  *See id.* ¶¶ 70-71.  For reasons discussed below, summary judgment will be granted in favor of CCR as to each of Miller's disability discrimination and retaliation claims under the ADA and PHRA.

## 1. <u>Failure to Accommodate Under the ADA and PHRA</u>

"Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). "Reasonable accommodation" includes measures such as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).  The ADA specifies that an employer discriminates against a qualified individual with a disability when it does not make a reasonable accommodation for his physical or mental limitations "unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business."  *Twillie v. Erie Sch. Dist.*, 575 F. App'x 28, 32 (3d Cir. 2014) (citing 42 U.S.C. § 12112(b)(5)(A)).

A plaintiff alleging discrimination under the ADA must make a *prima facie* case with the following three elements: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an adverse employment decision as a

---

[10]  For the reasons stated in n.9, *supra*, the Court presumes Miller has abandoned his claim that CCR did not hire him for the Warehouse Manager position in retaliation for requesting an accommodation.  *See* Compl. ¶ 70.

result of discrimination. *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). In addition, to survive summary judgment on a failure to accommodate claim, a plaintiff must establish that: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (citation omitted).

As stated, Miller claims that he was a qualified individual with a disability in February 2012, and he requested a reasonable accommodation to return to the Account Manager position, but CCR failed to accommodate him even though it would not have been unreasonably burdensome to do so. *See* Compl. ¶¶ 56-59. CCR argues that summary judgment should be entered on Miller's ADA claims because he cannot establish any of the elements of a *prima facie* case of disability discrimination. *See* Def's Mem. at 3-12. Specifically, concerning Miller's failure to accommodate claim, CCR contends that there was no reasonable accommodation that would have allowed Miller to perform the essential functions of his job, and there is no merit to Miller's assertion that CCR failed to engage in the interactive process in good faith. *See id.* at 9-10, 12-14.

### a. Miller was a "disabled person" in February, 2012, when he was not returned to the Account Manager position.

In assessing Miller's failure to accommodate claim, we first must determine whether he was disabled within the meaning of the ADA in February 2012, when he claims CCR failed to return him to the Account Manager position. CCR argues that Miller was not disabled, essentially because he only was subject to a temporary lifting restriction following his stroke. *See* Def.'s Mem. at 3-6.

CCR's argument overlooks the impact of the ADA Amendments Act ("ADAAA"), which became effective on January 1, 2009. The ADAAA was enacted to expand the scope of the statute: "[t]he definition of disability . . . shall be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this Act." *Jacobs v. York Union Rescue Mission, Inc.*, Civil Action No. 1:12-CV-0288, 2014 WL 6982618, at \*6 (M.D. Pa. Dec. 10, 2014) (quoting Pub. L. No. 110–325, § 4(a), 122 Stat. 3553, 3555). Although the ADAAA did not change the statutory definition of disability, it favors a broad construction of the term.[11] 42 U.S.C. § 12102(4)(A). Because the events involved in this case occurred after January 1, 2009, the standard set forth in the ADAAA governs Miller's claim.

As stated, in making a *prima facie* case of discrimination under the ADA, a plaintiff first must establish that he is a disabled person. An individual is disabled if he has: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C. § 12102(1).[12] The statute provides a non-exhaustive list of "major life activities," which

---

[11]    Because the PHRA has not been similarly amended, some courts have concluded that PHRA claims must be separately analyzed, at least with respect to issues concerning a claimant's "disability." *See, e.g., Szarawara v. County of Montgomery*, Civil Case No. 12-5714, 2013 WL 3230691, \*2, (E.D. Pa. June 27, 2013) ("[T]he PHRA has not been similarly amended, necessitating separate analysis of Plaintiff's ADA and PHRA claims."). Here, we need not conduct a separate analysis because we ultimately conclude that Miller cannot establish the second element of a *prima facie* case, namely that he was qualified to perform the essential functions of the Account Manager position with or without a reasonable accommodation. *See Rinehimer v. Cemcolif, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) (observing that Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts, thus "disposition of [a plaintiff's] ADA claim applies with equal force to his PHRA claim").

[12]    For purposes of Miller's claim that CCR failed to accommodate him in February 2012, because it did not return him to the Account Manager position, we conclude for reasons explained herein that he was actually disabled at that time. We will address Miller's claim that CCR discriminated against him by failing to hire him for the Market Development Manager position

include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A).  In addition, "[t]he term 'substantially limits' shall be constructed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA."  29 C.F.R. §1630.2(j)(1)(i).  "'Substantially limits' is not meant to be a demanding standard."  *Id.*  Whether an individual is substantially limited in performing a major life activity is a question of fact.  *Williams v. Philadelphia Hous. Auth. Police Dept.*, 380 F.3d 751, 763 (3d Cir. 2004).

The determination whether a plaintiff is disabled is analyzed as of the date of the adverse employment decision.  *See Taylor*, 184 F.3d at 308; *Rocco v. Gordon Food Serv.*, 998 F. Supp. 2d 422, 426 (W.D. Pa. 2014).  Therefore, we must determine whether Miller was disabled when CCR failed to return him to the Account Manager position in February, 2012.

CCR argues that Miller's claims are predicated on the fact that he suffered a stroke and was subsequently subject to a temporary lifting restriction for a three-month period, which is insufficient to establish that he is disabled within the meaning of the ADA.  *See* Def.'s Mem. at 4.  In support, CCR cites *MacFarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 275 (3d Cir. 2012), for the proposition that a temporary lifting restriction, which was removed four months after it was imposed, is a non-chronic impairment that is not covered by the ADA.  *See id.* at 5-6.  CCR's reliance on *MacFarlan* is inapposite because the events at issue there occurred in 2008, prior to the ADAAA and the broader construction it favors.  *See MacFarlan v. Ivy Hill SNF, LLC*, Civil Action No. 09-cv-2246, 2010 WL 3046531, at *5 (E.D. Pa. July 28, 2010).

---

and by terminating his employment because of his disability, record of disability and/or perceived disability in Section IV.B.2., *infra*.

Contrary to CCR's position, following enactment of the ADAAA, "[t]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting."[13] 29 C.F.R. § 1630.2(j)(1)(ix). The rules of construction explain that "if an individual has a back impairment that results in a 20–pound lifting restriction that lasts for several months, he is substantially limited in the major life activity of lifting, and therefore covered under the first prong of the definition of disability." 29 C.F.R. Pt. 1630, App. At the same time, "[t]he duration of an impairment is one factor that is relevant in determining whether the impairment substantially limits a major life activity. Impairments that last only for a short period of time are typically not covered, although they may be covered if sufficiently severe." *Id.*

Following Miller's stroke in November 2011, he was limited to lifting to more than 26 pounds. Def.'s SOMF ¶ 43, Miller Dep. Ex. 16. As a result of that limitation, Miller's therapist stated in February 2012, that "he [could not] safely perform his job duties as assigned, specifically 'periodic lifting [of] 50+ pounds.'" Miller Dep. Ex. 16. The undisputed evidence makes clear that Miller was substantially limited in the major life activity of lifting in February 2012, and therefore had an actual disability at that time. Although Miller was cleared to return to work in late May, 2012, Def.'s SOMF ¶ 54, the temporary nature of the restriction does not undermine the finding that he was substantially limited in lifting. Though Miller's impairment lasted a short period of time, it was sufficiently severe as evidenced by his therapist's assessment and CCR's subsequent determination that there was no reasonable accommodation which would permit him to return to the Account Manager position in February 2012. *See* Miller Dep. Ex. 16; Duffy Dep. Ex. 8.

---

[13] This is so for purposes of the actual disability prong. *See* 29 C.F.R. 1630.2(j)(1)(ix) (explaining that the six-month "transitory" part of the "transitory and minor" exception to "regarded as" coverage does not apply to the definition of disability under the "actual disability" prong or the "record of" disability prong).

In light of the broad construction of disability required by the ADAAA and the fact that "substantially limits" is not meant to be a demanding standard, and drawing all reasonable inferences in Miller's favor as we are required to do for purposes of summary judgment, the Court finds that Miller was substantially limited in the major life activity of lifting in February 2012. Accordingly, Miller had an actual disability at that time, which is when CCR determined that there was no reasonable accommodation which would permit him to return to the Account Manager position. Therefore, Miller was disabled in February 2012, for purposes of his *prima facie* case as it pertains to his failure to accommodate claim.

### b. Miller was not qualified to perform the essential functions of the Account Manager position with or without a reasonable accommodation.

Although Miller was disabled in February 2012, when CCR did not return him to the Account Manager position, he must next establish as part of his *prima facie* case that he was qualified to perform the essential functions of the job, with or without reasonable accommodations by CCR. *Gaul*, 134 F.3d at 580. A "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). This inquiry is divided into two parts: "(1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position." *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006) (citing 29 C.F.R. § 1630.2(m)). The determination of whether an individual with a disability is qualified is made at the time of the employment decision, not at the time of the lawsuit. *Gaul*, 134 F.3d at 580.

Neither party disputes that Miller satisfies the first part of this inquiry in that he had the qualifications to perform the Account Manager position. As to the second part of the inquiry, the evidence unequivocally shows that Miller could not return to that position in February 2012, *without* reasonable accommodation, because his therapist determined that he was limited to lifting no more than 26 pounds, thus "he [could not] safely perform his job duties as assigned, specifically, 'periodic lifting [of] 50+ pounds.'" Def.'s SOMF ¶ 43, Miller Dep. Ex. 16.

Therefore, we are confronted with the question of whether Miller could have performed the essential functions of the Account Manager position *with* reasonable accommodation. CCR argues that there was no reasonable accommodation which would have allowed Miller to perform the essential functions of his job, specifically periodic lifting of 50+ pounds. *See* Def.'s Mem. at 9-10. Miller disagrees, arguing that "the only accommodation needed from [CCR] was to allow [him] to return to work with a lifting restriction." Pl.'s Opp'n at 15.

An "essential function" of a position includes "fundamental job duties" of the position, as opposed to "marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function may be considered essential for reasons including, but not limited to, the following: (i) "the reason the position exists is to perform that function," (ii) only a limited number of employees are available "among whom the performance of that job function can be distributed," and/or (iii) the function is "highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." *Id.* § 1630.2(n)(2). The following evidence may be considered in determining whether a particular job function is essential: (i) the employer's judgment as to which functions are essential; (ii) written job descriptions prepared before advertising or interviewing applicants for the job; (iii) the amount of time spent on the job performing the function; (iv) the consequences of not requiring the incumbent to perform the function; (v) the

terms of a collective bargaining agreement; (vi) the work experience of past incumbents in the job; and/or (vii) the current work experience of incumbents in similar jobs. *Id.* § 1630.2(n)(3).

"[W]hether a particular function is essential is a factual determination that must be made on a case by case basis [based upon] all relevant evidence." *Turner*, 440 F.3d at 612 (internal quotation marks and citation omitted). The employer "has the burden of showing a particular job function is an essential function of the job." *Supinski v. United Parcel Serv., Inc.*, 413 F. App'x 536, 540 (3d Cir. 2011). Accordingly, summary judgment in favor of CCR is appropriate if we conclude that reasonable jurors "could not but find" that periodic lifting of 50+ pounds was an essential function of Miller's job as an Account Manager. *See Turner*, 440 F.3d at 612.

The evidence supports a finding that periodic lifting of 50+ pounds was an essential function of the Account Manager position. CCR deemed such lifting to be an essential function, as reflected by the fact that it was included in the job description of the Account Manager position. *See* Miller Dep. Ex. 2. To determine a store's inventory needs, Account Managers sometimes had to pull individual pallets of soda products out from rows of pallets in the stock room using a hand jack, or lift individual packs or cases of soda. Def.'s SOMF ¶ 14. In addition, Miller explained that CCR's policy was that the last man in the store was responsible for the account, which meant that Miller had to re-stock shelves if they were empty or if a merchandiser had not done his job. *Id.* ¶ 18. It was impossible for Miller to predict when that might occur, but he estimated that 25-30% of his work day involved lifting products. *Id.* ¶¶ 19, 46.

Miller attempts to create a factual dispute as to whether periodic lifting of 50+ pounds was an essential function of the Account Manager position by claiming that "the job description for an Account Manager lists periodic lifting of over 50 pounds, [but] that was ***never*** a part of the Account Manager job." Declaration of Robert D. Miller ("Miller Decl.") (ECF No. 32-1) ¶ 6 (emphasis

added). However, Miller previously testified that lifting a whole case of two-liter or 20-ounce products involved lifting approximately 50 pounds and he had to do that at least "occasionally," which meant on an unpredictable basis when store shelves were empty or a merchandiser did not do his job. Miller Dep. 33:9-34:3. Miller's own testimony contradicts his claim that periodic lifting of 50+ pounds "was never a part of the Account Manager job" and additionally undercuts any argument that such lifting was not an essential function of the Account Manager position.

In addition, the evidence of record contradicts Miller's assertion that he only was required to stock shelves "where needed" and CCR "actively discouraged Account Managers from performing this duty unless absolutely necessary." Pl.'s Opp'n at 2-3. As noted, Miller admitted that it was impossible to predict when he would have to stock shelves, but approximately one-quarter of his typical work day involved lifting products. Moreover, Miller has not pointed to evidence supporting his assertion that CCR discouraged Account Managers from stocking shelves.[14] For these reasons, there is no dispute that periodic lifting of 50+ pounds was an essential function of Miller's job as an Account Manager.

Having found that periodic lifting 50+ pounds was essential to the Account Manager position, we next turn to the question of whether Miller could perform that function with any reasonable accommodation which would have allowed him to return to work in February 2012.

A "reasonable accommodation" may include the following: "[j]ob restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modification of

---

[14]     Miller's assertion that CCR "actively discouraged" Account Managers from stocking shelves is contradicted by his own testimony that he had to re-stock shelves with the necessary products if the merchandiser had not done his job at a particular store. Def.'s SOMF ¶ 18; Miller Dep. 33:19-33:25. Mario Fiordilino also testified that although it was the merchandiser's primary responsibility to stock shelves, an Account Manager was required to do so when necessary. *See* Fiordilino Dep. 62:23-63:8.

equipment or devices . . . and other similar accommodations for individuals with disabilities." 29 C.F.R. § 1630.2(o)(2)(ii)). The employee "bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits." *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 670 (3d Cir. 1999) (citation omitted). If the employee makes such a showing, the burden then shifts to the employer to prove that the requested accommodation was unreasonable or would cause an undue hardship to the employer. *Id.*

Here, Miller failed to meet his burden of identifying a reasonable accommodation that would have enabled him to perform the essential functions of the Account Manager position in February 2012, specifically periodic lifting of 50+ pounds. Miller testified that he did not ask to return to the Account Manager position at that time, he was not aware of any accommodation that would have allowed him to do so, nor did he suggest any accommodation.[15] Miller Dep. 78:24-

---

[15] Miller attempts to create a factual dispute by asserting in his Declaration that no one from CCR asked him to identify an accommodation that would have allowed him to perform the essential functions of his job with his lifting restriction. *See* Miller Decl. ¶ 10. Miller's assertion is contradicted by his earlier deposition testimony in which he admitted that he spoke with Stephanie Duffy on March 9, 2012, he did not ask if he could return to the Account Manager position at that time, he was not aware of any accommodation that would have allowed him to do so, and he did not suggest any accommodation. Miller Dep. 77:22-78:1; 78:24-79:9. Duffy also testified that Miller did not know what accommodation he needed when she asked him. Duffy Dep. 139:1-139:13. Therefore, Miller's "conclusory, self-serving affidavit[] [is] insufficient to withstand a motion for summary judgment." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) (citation omitted); *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) ("[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict.")

Miller likewise fails to create a factual dispute by claiming that he did not suggest an accommodation because CCR had a 100% healed policy, and he was told by both his supervisor and Heather Wade that he could not return to work until he had no restrictions. *See* Pl.'s Opp'n at 16-17; Miller Decl. ¶¶ 11, 16. Again, Miller's assertion is contradicted by his earlier deposition testimony that CCR needed documentation from his therapist as to "where [he] was at the time to be released to come back with restrictions." Miller Dep. 76:13-77:1. Miller's own testimony undercuts his claim that CCR had a 100% healed policy, and rather shows that CCR was willing to consider his return to work with restrictions if that was possible.

Finally, Miller's belated suggestion of various ways in which he could have been accommodated does not create a factual dispute. *See* Miller Decl. ¶¶ 15a-d. Miller's claim that lifting was only an occasional part of his job is contradicted by his prior admission that he spent 25-30% of each work day lifting. Def.'s SOMF ¶ 46; Duffy Dep. 34:6-34:11. Miller's claim that most of the necessary lifting would be within his lifting restriction is contrary to his earlier testimony that he had to lift approximately 50 pounds at least occasionally, which meant on an unpredictable basis when store shelves were empty or a merchandiser did not do his job. Miller Dep. 33:9-34:3. Finally, Miller's suggestion that he could individually move bottles if the weight required to be lifted exceeded his restriction was not a reasonable suggestion in view of the fact that George Spencer testified that the Account Manager position "wasn't made to give you time to get everything done" and "you had to hustle" to get the job done. Deposition of George Spencer (ECF No. 38-5) 18:3-18:7.

79:9.  The fact that Miller did not suggest an accommodation that was reasonable is corroborated by Duffy's testimony that Miller did not know what accommodation he needed when she asked him.  Duffy Dep. 139:1-139:13.

In sum, Miller failed to identify any accommodation that would have allowed him to perform periodic lifting of 50+ pounds in February 2012, or to advance any evidence to show that CCR denied him an accommodation with respect to lifting.  In view of the fact that Miller was unable to perform the essential functions of the Account Manager position with or without an accommodation, Miller was not a "qualified individual" under the ADA, thus he cannot establish a *prima facie* case of disability discrimination or that CCR failed to accommodate him.  *See Rich v. Verizon New Jersey Inc.*, Civil Action No. 16-1895, 2017 WL 6314110, at *21 (D.N.J. Dec. 11, 2017) (explaining that the plaintiff's failure to establish a *prima facie* case of disability discrimination due to his in ability to perform various physical functions with or without an accommodation was fatal to his failure to accommodate claim).

Because Miller failed to demonstrate that he is a qualified individual, his argument that CCR did not engage in the interactive process in good faith also fails.  *See Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 193-94 & n.20 (3d Cir. 2009) (collecting cases holding that failure to engage in the interactive process is unimportant if an employee is not a qualified individual).  Nevertheless, even if Miller could establish that he was a qualified individual, the Court would find that CCR adequately engaged in the interactive process for reasons we explain below.

"To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  29

C.F.R. § 1630.2(o)(3). The interactive process requires "both parties . . . to assist in the search for appropriate reasonable accommodation and to act in good faith." *Taylor*, 184 F.3d at 312 (citation omitted). However, the interactive process "does not dictate that any particular concession must be made by the employer; nor does the process remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions." *Id.* at 317. "All the interactive process requires is that employers make a good-faith effort to seek accommodations." *Id.*

To show that an employer failed to engage in the interactive process, the employee must demonstrate that: (1) the employer knew about his disability; (2) the employee requested an accommodation for his disability; (3) the employer did not make a good faith effort to assist the employee; and (4) the employee could have been reasonably accommodated but the employer's lack of good faith. *Taylor*, 184 F.3d at 319-20.

Miller claims that he satisfied his duty to assist in the interactive process by providing his limitations to CCR and speaking with Stephanie Duffy regarding the same, but CCR failed to engage in the process in good faith. *See* Pl.'s Opp'n at 19-20. Miller's claim is not supported by the record.

Employers can show their good faith by taking steps such as the following: "meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome." *Taylor,* 184 F.3d at 317. In this case, the record shows that CCR took all of these steps: (1) CCR received a letter from Miller's therapist identifying his lifting restrictions and therefore was aware that he was limited to lifting no more than 26 pounds; (2)

Duffy conferred with Miller to determine what part of his job he was unable to perform, and Miller explained that he was limited in lifting, but he typically spent 25-30% of his day lifting; (3) Miller did not suggest any accommodation and in fact did not know what accommodation was needed when Duffy asked him;[16] (4) Duffy conferred with Miller's supervisors and other CCR representatives to determine if an accommodation was possible and completed a report documenting the interactive process; and (5) after CCR determined there was no reasonable accommodation that would have allowed Miller to perform the essential functions of the Account Manager position, Duffy spoke with Miller and they agreed that CCR would continue him on his leave of absence. *See* Duffy Dep. 33:23-34:11, 139:1-139:13; Duffy Dep. Exs. 8 and 11; Miller Dep. 77:18-79:9; Miller Dep. Exs. 16 and 17. Under these circumstances, the Court concludes that CCR satisfied its obligation to engage in the interactive process in good faith.

To summarize, although Miller asserts that CCR should have accommodated his lifting restriction, he has not presented evidence that a reasonable accommodation existed which would have allowed him to return to the Account Manager position in February, 2012. Absent evidence showing that a reasonable accommodation would have allowed him to perform the essential functions of the Account Manager position, including periodic lifting of 50+ pounds, a jury could not find in Miller's favor on this element. Further, the record demonstrates that CCR met its obligation to engage in the interactive process in good faith. Therefore, summary judgment is appropriate on Miller's failure to accommodate claim.

---

[16]     Miller's failure to demonstrate a reasonable accommodation precludes him from claiming that CCR's investigation concerning a reasonable accommodation was insufficient. *See Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997) (citing *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997) ("[W]here a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant. . . . The ADA, as far as we are aware, is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made.").

## 2. **Disability Discrimination Under the ADA and PHRA**

Miller alleges that CCR discriminated against him by failing to hire him for the Market Development Manager position and by terminating his employment because of his disability, record of disability and/or perceived disability. *See* Compl. ¶¶ 63-65. CCR argues that Miller cannot establish a *prima facie* case of disability discrimination under the ADA but, even if he could, CCR has articulated legitimate, non-discriminatory reasons for its employment actions. *See* Def.'s Mem. at 14-17. In addition to maintaining that he has established a *prima facie* case, Miller contends that the record contains sufficient evidence of pretext to defeat summary judgment. *See* Pl.'s Opp'n at 20-21.

In assessing a discrimination claim for disparate treatment under the ADA, courts employ the *McDonnell Douglas* burden-shifting framework. *Walton*, 168 F.3d at 667-68. If a plaintiff makes out a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the employer does so, the burden shifts back to the plaintiff to show that the stated reason is a pretext for discrimination. *Id.* at 804.

Miller is unable make out a *prima facie* case of discrimination based on CCR's failure to hire him for the Market Development Manager position and termination because he has not established that he qualifies under any definition of disability. *See* 42 U.S.C. § 12102(1) (specifying that an individual may qualify as disabled if his impairment substantially limits a major life activity, if he has a record of an impairment or if he is regarded as having an impairment).

With regard to Miller's claim under the actual disability prong, the relevant inquiry is whether Miller was disabled at the time of the adverse employment decision. *See Taylor*, 184 F.3d at 308; *Rocco,* 998 F. Supp. 2d at 426. The first adverse employment decision occurred when

Miller was not hired for the Market Development Manager position, for which he interviewed on August 8, 2012. Def.'s SOMF ¶¶ 64, 70. The second adverse employment decision occurred when CCR terminated Miller's employment effective May 30, 2013. *Id.* ¶ 74; Miller Dep. Ex. 22.

The adverse employment decisions occurred three months and one year, respectively, *after* Miller was cleared to return to work with no restrictions on or about May 25, 2012. Def.'s SOMF ¶¶ 54, 64, 70, 74. Therefore, the record does not support a finding that Miller was substantially limited in a major life activity when either of the two adverse employment decisions occurred. Accordingly, no reasonable jury could conclude that Miller qualifies under the actual disability prong, even under the less restrictive interpretation required by the ADAAA.

Next, Miller does not qualify as disabled under the "record of" impairment prong. "An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1). Thus, Miller must identify evidence from which a factfinder could reasonably conclude that he "has a history of . . . or has been misclassified as" having an impairment that limits a major life activity. Additionally, Miller must "provide evidence that [CCR] relied upon [his] record of impairment in making its employment decision." *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 437 (3d Cir. 2009).

In this case, Miller has failed to provide evidence on both fronts. He has not pointed to any evidence from which a factfinder could reasonably conclude that he has a history of cardiac problems with resulting physical limitations, nor has he provided evidence that CCR relied on any such evidence in failing to hire him for the Market Development Manager position or in terminating his employment. Beyond these failures, it is significant that "a relatively short-term

absence from work, without any long-term impairment, is generally held to be insufficient to create a record of disability." *Eshelman*, 554 F.3d at 437.

Finally, Miller does not qualify as disabled under the "regarded as" prong. That prong is satisfied "if the individual establishes that he or she has been subjected to an [adverse employment decision] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). However, a plaintiff cannot advance a "regarded as" disability claim for "impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." *Id.* § 12102(3)(B); *see also Michalesko v. Freeland Borough*, 658 F. App'x 105, 107 (3d Cir. 2016). "[T]he relevant inquiry is whether the impairment that the employer perceived is an impairment that is objectively transitory and minor." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014).

The record makes clear that CCR was aware that Miller had a lifting restriction following his stroke based on information it received from Miller's therapist. Def.'s SOMF ¶ 43, Miller Dep. Ex. 16. However, Miller's therapist did not state that Miller would be permanently subject to a lifting restriction. Miller Dep. Ex. 16. Miller's lifting restriction was objectively transitory and minor, as he was cleared to return to work with no restrictions six months after suffering a stroke and three months after the lifting restriction was documented. Def.'s SOMF ¶ 54. For this reason, Miller is unable to show that CCR regarded him as disabled.

Because Miller does not qualify as disabled, he cannot establish a *prima facie* case of discrimination under the ADA based on CCR's failure to hire him for the Market Development Manager position or based on his termination. Even if Miller could do so, CCR has articulated legitimate, non-discriminatory reasons for those employment actions. Miller was not hired for the

Market Development Manager position because Eric Storer, who interviewed Miller, determined that other candidates were better suited for the position. Storer Decl. ¶¶ 10, 12. CCR ultimately terminated Miller's employment because he did not secure a position with CCR prior to the expiration of his second SPLOA period. Def.'s SOMF ¶ 74; Miller Dep. Ex. 22. Finally, as previously discussed, Miller has not shown that CCR's stated reasons are a pretext for discrimination. *See supra* pp. 13-14. Accordingly, summary judgment will be entered in favor of CCR on Miller's disability discrimination claim under the ADA and PHRA.

### 3. <u>Retaliation Under the ADA and PHRA</u>[17]

Miller claims that CCR retaliated against him after he requested an accommodation by failing to hire him for the Market Development Manager position and by terminating him.[18] *See* Compl. ¶ 70. The retaliation provision of the ADA states: "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). ADA retaliation claims are analyzed under the *McDonnell Douglas* burden shifting framework. *Williams*, 380 F.3d at 759 n.3. First, a plaintiff must establish a *prima facie* claim of retaliation under the ADA by showing the following: (1) he engaged in protected activity; (2) his employer

---

[17] Retaliation claims under the ADA and PHRA are properly analyzed under the same legal standard. *See Baker v. United Defense Indus., Inc.* 403 F. App'x 751, 754 n. 4 (3d Cir. 2010) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

[18] In opposing CCR's summary judgment motion (ECF No. 30), Miller did not make any argument in support of his retaliation claim and thus essentially abandoned that claim. *See Venter v. Potter*, 694 F. Supp. 2d 412, 425 n. 8 (W.D. Pa. 2010), *aff'd*, 435 F. App'x 92 (3d Cir. 2011) (finding that the plaintiff abandoned his discrimination claims under the ADEA and Rehabilitation Act by failing to respond to arguments raised by the defendants in support of their summary judgment motion). Regardless of whether Miller intended to abandon his retaliation claim, he failed to establish a *prima facie* case of retaliation for the reasons explained in this section.

took adverse action after or contemporaneous with his protected activity; and (3) a causal link exists between his protected activity and the employer's adverse action. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). If the plaintiff makes out a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment decision. *Williams*, 380 F.3d at 759 n.3. If the employer carries this burden, the plaintiff must prove by a preponderance of the evidence that the employer's reason was a pretext for retaliation. *Id.*

As stated, Miller claims that CCR retaliated against him after he requested an accommodation, which is a protected activity under the ADA. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010) ("Prohibited discrimination under the ADA includes retaliation against an employee for requesting an accommodation."). However, Miller has not established a causal link between his request for an accommodation and CCR's decision not to hire him for the Market Development Manager position and to later terminate his employment.

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). Here, Miller offered no evidence of antagonism and there is not an unusually suggestive temporal proximity between Miller's request for an accommodation in February 2012, and CCR's decision not to hire him for the Market Development Manager position 6 months later in August 2012, or his termination 15 months later in May 2013. *See Williams*, 380 F.3d at 760-61 (finding no causal link where over 2 months elapsed between request and termination).

Even assuming Miller could establish a *prima facie* case, he has not shown that CCR's stated reasons for not hiring him for the Market Development Manager position and for terminating him were not CCR's true reasons, but were instead a pretext for retaliation. Accordingly, summary judgment will be entered in favor of CCR on Miller's ADA and PHRA retaliation claim.

### V.     <u>CONCLUSION</u>

The Court finds that there are no material facts in dispute, and Miller is unable to show that CCR violated his rights under the ADA, ADEA or the PHRA.  Accordingly, CCR's motion for summary judgment will be granted.  An appropriate order will follow.

<u>s/ David Stewart Cercone</u>
David Stewart Cercone
United States District Judge

cc:     James W. Carroll, Jr., Esquire
         Ryan P. Stewart, Esquire
         Theodore A. Schroeder, Esquire
         Allison R. Brown, Esquire

         *(Via CM/ECF Electronic Mail)*